**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION**


DAVID ANDERSON
ADC #87638                                                                                    PETITIONER

VS.                                          5:06CV00108 WRW/JTR

LARRY NORRIS, Director,
Arkansas Department of Correction                                            RESPONDENT

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

## INSTRUCTIONS

The following recommended disposition has been sent to United States District Judge William R. Wilson, Jr.  Any party may serve and file written objections to this recommendation. Objections should be specific and should include the factual or legal basis for the objection.  If the objection is to a factual finding, specifically identify that finding and the evidence that supports your objection.  An original and one copy of your objections must be received in the office of the United States District Clerk no later than eleven (11) days from the date of the findings and recommendations.  The copy will be furnished to the opposing party.   Failure to file timely objections may result in waiver of the right to appeal questions of fact.

If you are objecting to the recommendation and also desire to submit new, different, or additional evidence, and to have a hearing for this purpose before the United States District Judge, you must, at the same time that you file your written objections, include a "Statement of Necessity" that sets forth the following:

1.      Why the record made before the Magistrate Judge is inadequate.

2.      Why the evidence to be proffered at the requested hearing before the United States District Judge was not offered at  the hearing before the Magistrate Judge.

3.      An offer of proof setting forth the details of any testimony or other evidence (including copies of any documents) desired to be introduced at the requested hearing before the United States District Judge.

From this submission, the United States District Judge will determine the necessity for an additional evidentiary hearing, either before the Magistrate Judge or before the District Judge.

Mail your objections and "Statement of Necessity" to:

Clerk, United States District Court
Eastern District of Arkansas
600 West Capitol Avenue, Room A149
Little Rock, AR 72201-3325

## I. Background

Pending before the Court is a § 2254 habeas Petition filed by Petitioner, David Anderson. (Docket entry #1.)  Respondent has filed a Response (docket entry # 13) in which he argues that the habeas Petition should be dismissed.  Before reaching the merits of Petitioner's habeas claims, the Court will review the relevant procedural history associated with Petitioner's state court conviction and appeals.

On September 16, 1999, Petitioner was convicted by a Greene County jury of the first-degree murder of Jerry Markum and was sentenced to 40 years' incarceration in the Arkansas Department of Correction.[1]  Petitioner appealed to the Arkansas Court of Appeals, where he argued that the trial court erred: (1) in refusing to grant a continuance; (2) in allowing the prosecution to introduce evidence of his violent character; and (3) in proceeding to trial without a finding that he was mentally

---

[1]At trial, Petitioner claimed that he shot Markum in self-defense.

2

fit.  The Court held that the trial court had improperly allowed into evidence testimony regarding Petitioner's disposition for violence, reversed Petitioner's conviction, and remanded the case for a new trial.  *Anderson v. State*, 71 Ark. App. 200, 33 S.W.3d 173 (2000).

Petitioner was retried on November 13-15, 2001.  The jury convicted Petitioner of first-degree murder and sentenced him to life imprisonment in the Arkansas Department of Corrections.

On direct appeal to the Arkansas Supreme Court, Petitioner argued that: (1) he was denied a fair trial when the trial court allowed him to be cross-examined about prior felony convictions that were more than ten-years old; (2) the trial court erred in excluding testimony regarding specific instances of conduct relating to the victim's violent character; (3) the trial court erred in excluding the testimony of a witness that the victim had threatened to break Petitioner's  neck; (4) a witness was improperly allowed to testify as to what Petitioner feared the consequences of the shooting would bring; and (5) the trial court erred in allowing the State to use an unsworn transcript of a tape during the examination of one of its own witnesses.[2]  The Court rejected these arguments and affirmed.  *Anderson v. State*, 354 Ark. 102, 118 S.W.3d 574 (2003).

Petitioner then filed a timely *pro se* Petition for Rule 37 relief with the trial court arguing that: (1) his attorney was ineffective in not obtaining a ruling at trial regarding the introduction of Petitioner's more than ten-year-old prior felony convictions; (2) his attorney was ineffective in not calling certain witnesses to establish Petitioner knew of the victim's violent nature; (3) there was a direct conflict of interest between Petitioner and his attorney due to a § 1983 suit Petitioner filed against him; (4) his attorney was ineffective in not moving to quash the jury panel and obtaining a

---

[2]According to Petitioner, the prosecution never presented the tape to his attorneys and, at the time of trial, no longer possessed the tape.

change of venue; (5) the trial court abused its discretion in finding that Petitioner had sued a number of his previous attorneys; and (6) prosecutorial misconduct occurred in connection with the prosecutor eliciting testimony regarding Petitioner's prior felony convictions. (Rule 37 Tr. at 10-17.) On March 5, 2004, the trial court, without conducting a hearing, entered an order denying the Petition for Rule 37 relief. (Rule 37 Tr. at 54-56.)

Petitioner appealed the denial of Rule 37 relief to the Arkansas Supreme Court. On January 26, 2006, the Court affirmed the trial court's decision. *Anderson v. State*, 2006 WL 182066 (Ark. 2006) (unpublished per curiam).

## II. Discussion

On May 1, 2006, Petitioner filed this federal habeas action (docket entry #2), in which he asserts the following grounds for habeas relief: (1) he had a direct conflict of interest with his trial counsel and the trial court failed to investigate that conflict ; (2) the trial judge engaged in judicial misconduct; (3) the trial judge made a ruling at trial that was inconsistent with a prior ruling on a motion in limine; and (4) ineffective assistance of counsel. Respondent argues that all of Petitioner's claims are either procedurally defaulted or fail on the merits. Petitioner has filed numerous pleadings (docket entries #14, #92, #96, #101-#107), which constitute his Reply. Thus, the issues are joined and ready for disposition.

For the reasons explained below, the Court concludes that Petitioner's habeas claims either fail on the merits or are barred by the doctrine of procedural default. Thus, the Court recommends that the Petition for a Writ of Habeas Corpus be denied, and the case be dismissed, with prejudice.

## A.    Testimony Giving Rise To Petitioner's Habeas Claims

On September 12, 1998, Paragould police officer J.D. Stephenson responded to a homicide

4

call at the residence of Troy Ray.  (Second Trial Tr. 412.)  After finding Jerry Markum's body inside the house,[3] Stephenson was told that Petitioner was renting the back bedroom of the Ray residence. (Second Trial Tr. 415-420.)  Petitioner was arrested the following day in a motel room in Hayti, Missouri.  (Second Trial Tr. 420.)  Stephenson identified drug paraphernalia in the house which he believed was used for ingesting methamphetamine, including a syringe found in Markum's shirt pocket.  (Second Trial Tr. 437.)

Troy Ray testified that Petitioner had been renting his back bedroom for about two weeks prior to the shooting.  (Second Trial Tr. 446.)   There were seven people in the house the day of the shooting: Ray, Markum, Petitioner, Ricky Rogers, Sam Roberts, Billy "Bird" Lyles, and Timothy McDaniel.  (Second Trial Tr. 448.)  Petitioner and McDaniel came through the front door, and Petitioner began "having words" with Rogers about being in his room.  (Second Trial Tr. 453-454.) Markum then told Petitioner:  "Look, you done the same thing to me."  (Second Trial Tr. 456.)  Ray broke the argument up and Markum sat down in a chair.  Petitioner then left and came back with a .22 revolver in his hand.  (Second Trial Tr. 457-458.)  Petitioner shot at Markum five times.  (Second Trial Tr. 460.)  Ray did not see Markum do anything threatening towards Petitioner, although he acknowledged his testimony, during the first trial, that Markum hit Petitioner and knocked his glasses off prior to the shooting.  (Second Trial Tr. 460-466.)  After the shooting, Petitioner left the house in Ray's van.

Billy Lyles testified that he saw Petitioner ask Ray for a pistol, and that he gave it to him.

---

[3]The medical examiner testified that Markum died as a result of four gunshot wounds. Markum's blood was tested for alcohol and methamphetamine.  The results were negative.  (Second Trial Tr. 631.)  Markum's urine tested positive for methamphetamine, leading the medical examiner to testify at trial that the drug was far along in the elimination process and would not have effected Markum's central nervous system.

(Second Trial Tr. 505.)  Lyles heard an argument and saw Petitioner and Markum in front of the bedroom door, with Petitioner rubbing his own arm.  (Second Trial Tr. 506.)  Markum then came in the living room, sat down in a chair, and told Petitioner:  "You can get that pistol.  I'm not afraid of it."  (Second Trial Tr. 529.)  Petitioner then came into the living room and started shooting at Markum, who was looking through window blinds at the time.  (Second Trial Tr. 509.)  Petitioner then said something to the effect of "that'll show" Markum for hitting him.  According to Lyles, Markum was out on bond the day of the shooting and had a  paranoid demeanor from a methamphetamine habit.  (Second Trial Tr. 523.)   A few days earlier, Lyles had an argument with Markum over giving him some bad methamphetamine.  (Second Trial Tr. 532.)  Markum expected to be paid, and Lyles feared Markum would hurt him if he did not pay.  Markum had a reputation for violence.  (Second Trial Tr. 532.)

Timothy McDaniel testified that he was present when the shooting occurred, but did not see it.  (Second Trial Tr. 541.)  He saw Petitioner punching and shoving Rogers for being in his room.  (Second Trial Tr. 546.)  Markum then pushed Petitioner to the side.  Petitioner said he did not want to fight, and then Markum hit Petitioner on the side of the head, knocking his glasses off.  (Second Trial Tr. 547.)  According to McDaniel, Markum went into the living room and continued to yell at Petitioner.  (Second Trial Tr. 548.)  He heard Markum yell:  "If you get that gun, or you pull that gun, I'm gonna cut you," and heard gunshots seconds later.  (Second Trial Tr. 551-553.)  Everyone began leaving the house, and McDaniel got into Ray's van with Petitioner.  (Second Trial Tr. 557.)  As they drove down a road, Petitioner took a gun from his waist belt and threw it from the window.  (Second Trial Tr. 562-563.)  They ended up in an old motel in Hayti, Missouri.  (Second Trial Tr. 563.)

McDaniel testified that Petitioner kept saying:  "God, why did I do that. I hope he don't die"; and "I'll probably spend the rest of his life in prison."   (Second Trial Tr. 563-565.)  McDaniel then called his girlfriend and told her to call the police so that he could turn himself in.

McDaniel never saw Markum with a weapon.  (Second Trial Tr. 568-570.)  Earlier, on the day of the shooting, McDaniel had seen police cars at Markum's house.  (Second Trial Tr. 571-573.) McDaniel knew Markum had been in several fights, including fights with police officers.  (Second Trial Tr. 578.)  At the time of the shooting, Markum appeared to be "drinking or on crystal." (Second Trial Tr. 578.)  On the day of the shooting, McDaniel testified that he had injected himself with methamphetamine in Ray's house, with Ray and Petitioner present.  (Second Trial Tr. 583.)

Ricky Rogers testified that he and Markum were confronted by Petitioner about being in his room.  (Second Trial Tr. 589.)  Markum hit Petitioner in the face knocking his glasses off.  (Second Trial Tr. 589-590.)  Markum then went into the living room and sat in a chair. Petitioner asked Ray where his gun was, and then he saw Petitioner with a gun shooting at Markum.  Rogers was doing crystal meth with Ray and Sammy Roberts that day.  He had also given Markum meth that day. (Second Trial Tr. 601.)  Rogers knew of Markum's reputation for violence.  (Second Trial Tr. 607.)

In presenting his defense, Petitioner called Kyle McDaniel, who testified to a conversation he had in prison with Billy Lyles.  Lyles told McDaniel that he did not care whether it was self-defense or not, but he was going to testify against Petitioner because he had killed his friend. (Second Trial Tr. 642.)

Petitioner testified that the day of the shooting he went to Markum's house to check on him and to retrieve a pair of boots he had left there.  (Second Trial Tr. 654.)  At the house, he saw police and was told that Markum was threatening to throw people off of his balcony.  (Second Trial Tr.

654.)  According to Petitioner, Markum would always get mad and tell his neighbors, Barry Parker

and Connie Anthony, that he would kill them and throw them off of the balcony.  Petitioner then

went to Ray's house.  Later, Markum arrived and stated that the police were looking for him.

Petitioner testified that he knew Markum was having problems, and that Markum could not control

his temper.

Petitioner also testified that, the day of the shooting, he saw Markum beat Fred Scott bloody

for bringing the wrong order of soda drinks.   (Second Trial Tr. 657.)  He also knew that Markum

was beating up his girlfriend, Connie Anthony.  Markum's next-door neighbors, Barry Parker and

Nadine Lucy,  would sometimes hide Connie Anthony, and they also received threats from Markum.

(Second Trial Tr. 659.)   Petitioner described an incident in which Markum attacked police, and in

which he broke a shotgun over Lisa Tate's back.  (Second Trial Tr. 680.)

At the Ray house, Petitioner asked Rogers what he was doing in his room.  Markum then

came out of his room, and had a look in his eye like Petitioner was his target.  Markum hit him,

knocking his glasses off.  Petitioner repeatedly told Markum he did not want to fight him.  Markum

continued to threaten Petitioner and told him that he should cut his guts out.  Markum then said "get

that gun," reached to his left leg, and lunged at Petitioner.  Petitioner, fearing that Markum was going

to cut him with a knife, grabbed a pistol on a dish drain and began firing the gun.

Richard Clark testified that Troy Ray told him that he saw Markum hit Petitioner, and that

he handed him a gun to use in self-defense because Markum was going for a knife.  Lisa Tate

testified that Markum had a reputation for violence and that he was always fighting.  Robert Lee

"Sammy" Roberts testified that Markum had a reputation as a violent "bad ass" in the community.

(Second Trial Tr. 726.)

8

Dr. Martha Gore, an optometrist, testified that Petitioner had 20/400 uncorrected vision, and that a defense exhibit, a pair of eyeglasses, would duplicate the effect of Petitioner's uncorrected vision. Dr. Jimmy Valentine, a board-certified forensic examiner in clinical pharmacology, testified about the effects of methamphetamine. Dr. Valentine stated that 25% of the population has a violent reaction to methamphetamine. He also described a "flashback" characteristic for this subset of people, who could still show violent behavior even after being devoid of methamphetamine for days, with only a trace in the urine. Concerning the discrepancy in Markum's blood and urine tests, Dr. Valentine testified that drug screens could show residual amounts of methamphetamine in urine but not in blood. Another scenario was that the person had just used methamphetamine, and it had been distributed from the blood to other areas of the body, including the brain. A third possibility was that the cutoff level for the blood screen used on Markum's blood was at such a level that any methamphetamine in the blood was simply below that level.

## B.    Analysis of Petitioner's Habeas Claims

### 1.    Conflict of Interest

Petitioner argues that his trial counsel had an actual conflict of interest, and that the trial court did not sufficiently investigate his allegations regarding this conflict of interest. Prior to his second trial, attorneys Joe Perry and Gerald Coleman were appointed to represent Petitioner. Mr. Perry subsequently moved to withdraw due to logistical reasons[4] and because Petitioner had filed a federal lawsuit against him.[5] (Docket entry #14 at 23.) Petitioner also filed a *pro se* Motion seeking to have

---

[4]Perry claimed his Marianna office was a long distance from Petitioner and his office had a difficult time processing collect calls from the jail.

[5]On March 13, 2001 Petitioner filed a 42 U.S.C. § 1983 action against Perry alleging 14 separate grounds in support of a claim that Perry was not properly defending his case. *See Anderson*

Mr. Perry removed as one of his attorneys because he was unresponsive and would not communicate with Petitioner.  The trial court denied Petitioner's *pro se* motion and noted that three prior attorneys had been terminated from representation in the case, including one that Petitioner sued, and that Petitioner's federal § 1983 action against Perry was filed solely to create a conflict of interest and to obstruct the proceedings.[6]  (Docket entry #14 at 21.)

Petitioner argues that Perry had an actual conflict of interest arising from the § 1983 action and that Perry retaliated against Petitioner for filing that action by providing him with ineffective assistance of counsel.  The Arkansas Supreme Court rejected Petitioner's conflict of interest argument in Petitioner's Rule 37 appeal, concluding that Petitioner did not demonstrate an actual conflict of interest warranting withdrawal by Perry or further investigation by the trial court.   The court cited *Townsend v. State*, 350 Ark. 129, 85 S.W.3d 526 (2002), as controlling authority for the

---

*v. Perry*, E.D. Ark. No. 3:01CV00076 SMR at docket entry #2.  Petitioner requested that Perry be fined $1 million dollars. *Id.*  On April 18, 2001, the United States District Court denied Petitioner's request to proceed *in forma pauperis,* pursuant to the Prison Litigation Reform Act, and dismissed the case  *Id.* at docket entry #4.

[6]The record reflects that, in Petitioner's first trial, Public Defender Michael Langley was initially appointed to represent him.  (First Trial Tr. 28.)  After Langley resigned from the Public Defender's Office, Public Defender Joe Hughes was substituted as counsel.  (First Trial Tr. 28.)  Petitioner then filed *a pro se* "Writ of Habeas Corpus" in his criminal case claiming that Hughes had violated multiple provisions of the Rules of Professional Conduct by not adequately preparing his case.  (First Trial Tr. 36.)  Mr. Hughes subsequently filed a Motion to Withdraw, alleging that Petitioner had refused to comply with his recommendations in proceeding with the defense of the case. (First Trial Tr. at 62.)  Private attorney Mark Rees was then appointed to represent Petitioner, and Rees acted as Petitioner's attorney in the first trial.

Petitioner later attempted to file a "replevin" complaint against Attorney Rees for the return of his criminal case file, alleging that Rees had converted it. Rees was allowed to withdraw following Petitioner's conviction, and the Public Defender's Office was substituted in his place. (First Trial Tr. at 102.) Val Price from the Public Defender's Office filed the Notice of Appeal from Petitioner's first conviction.  (First Trial Tr. at 125-126.)  Prior to Petitioner's second trial, the Public Defender's Office was allowed to withdraw, and private attorney Joe Perry was appointed to represent Petitioner.

proposition that prejudice is not presumed simply because a defendant had filed a lawsuit against his attorney.   The Court further concluded that Petitioner had failed to maintain his burden of establishing that he had been prejudiced by the alleged conflict:

> The allegations in the petition are conclusory and do not provide sufficient factual support to show an actual conflict or a reasonable probability that the decision reached would have been different if the alleged errors had not been committed. None of appellant's allegations of error by counsel, including the failure to request a change of venue and the failure to call witnesses, provides a basis to find an actual conflict. At best, those allegations show that counsel and appellant disagreed on trial strategy. Counsel is not required to substitute the judgment of the accused for his or her own professional judgment. *See Hadley v. State*, 322 Ark. 472, 910 S.W.2d 675 (1995). Our review of the record does not support appellant's claim that counsel were openly hostile, or otherwise acted unprofessionally. Nor did the petition present a sufficient factual basis to support a claim of prejudice. As we noted in our opinion on appellant's direct appeal of his conviction, evidence of appellant's guilt was overwhelming.

*Anderson*, 2006 WL 182066 at *3.

In analyzing Petitioner's conflict of interest argument, the Arkansas Supreme Court used the correct legal standard applicable to a constitutional claim involving an alleged conflict of interest.[7] This Court cannot say that the decision was an objectively unreasonable application of that standard. Neither has Petitioner made a showing that the Arkansas Supreme Court's decision rested on an unreasonable determination of the facts, which are presumed to be correct.   Thus, the Court recommends that this ground for habeas relief be denied.

---

[7]The Arkansas Supreme Court relied on *Townsend v. State,* 350 Ark. 129, 85 S.W.3d 526 (2002), which expressly acknowledged the so-called *Cuyler* rule.  In *Cuyler v. Sullivan*, 446 U.S. 335 (1980), the Court held that a defendant must show an active conflict of interest that adversely affected his defense.  While prejudice is presumed under *Cuyler,* if an actual conflict is established, the Court has declined to extend this presumption beyond those situations in which an attorney has attempted to represent multiple co-defendants.  *See Mickens v. Taylor*, 535 U.S. 152, 174-75 (2002). Outside of that narrow situation, a defendant alleging a conflict of interest with his attorney must establish actual prejudice with respect to the outcome of the trial.  *Id.*  According to the Arkansas Supreme Court, Petitioner did not meet this burden.

**2.      Misconduct by the Trial Judge**

Petitioner also contends that the trial court engaged in misconduct in denying his motion to have Perry withdraw based on a conflict of interest.  Petitioner bases this argument on the following information cited by the court in its order denying the motion: (1) Petitioner had previously sued a lawyer that represented him in an attempt to create a conflict; and (2) multiple appointed lawyers had previously been appointed to represent him in the case and were allowed to withdraw.  According to Petitioner, this information is incorrect because there is no record of him ever suing any lawyer, other than Perry, and only attorneys Perry and Coleman represented him in the second trial.

Respondent contends this argument is procedurally defaulted because Petitioner did not raise it in his Rule 37 appeal; thereby depriving the Arkansas Supreme Court of an opportunity to rule on the argument.  In his Reply, Petitioner has filed numerous pleadings in which he claims that the issue was raised and briefed before the Arkansas Supreme Court.

The Court concludes that Respondent's procedural default argument is without merit.  The Arkansas Supreme Court's decision reflects that Petitioner raised this argument, which was considered and rejected on the merits.  The Court specifically noted Petitioner's allegation that the trial court's order denying his motion to withdraw contained information that was not correct.  However, the Court went on to hold that, even assuming the order did contain information that was not correct, there was no misconduct by the trial court:

> Appellant's remaining issues assert error based upon actions of the court, rather than trial counsel. A petitioner may qualify for relief under Ark. R.Crim. P. 37.1, regardless of trial counsel's performance, if he demonstrates error so fundamental as to render the judgment of conviction void and subject to collateral attack. *Cothren v. State*, 344 Ark. 697, 42 S.W.3d 543 (2001). However, because appellant has not demonstrated an actual conflict, under *Townsend*, the trial court had no obligation to investigate his claims of conflict, *and even were the order denying counsel's motion*

12

*to withdraw based upon incorrect information as appellant asserts, the denial would not have been error.*

*Anderson*, 2006 WL 182066 at *3 (emphasis added).

The essential premise of Petitioner's "misconduct" claim is that the trial court used "false" information as a basis for denying his motion to require Perry to withdraw as one of his attorneys. However, as noted by the Arkansas Supreme Court, even if the order did contain inaccurate information, Petitioner was *not* entitled to the requested relief.[8]   Petitioner has not established that the Arkansas Supreme Court's disposition of this claim was contrary to, or an unreasonable application of, federal law, nor an unreasonable determination of the facts based on the record of the state court proceeding.   Thus, the Court recommends that this ground for habeas relief be denied.

### 3.        The Trial Court's Failure to Exclude Petitioner's Prior Felony Convictions

Before his second trial, the court granted Petitioner's Motion In Limine to exclude his prior felony convictions, all of which were more than 10-years old.  At trial, Petitioner's attorney asked him, at the beginning of his direct examination, if he "[had] ever been – you've been in trouble with the law, haven't you?"  (Second Trial Tr. 652.)  Petitioner responded "Yes, I Have."  *Id.*  Defense counsel then proceeded to question Petitioner about the events of the shooting.

During cross-examination, the following exchange took place between Petitioner and the prosecutor:

PROSECUTOR: One thing I did forget to ask you. Right at the first of your direct

---

[8]At best, Petitioner is disingenuous in his reading of what is allegedly "false" in the trial court's order denying his motion requesting that Mr. Perry withdraw due to a conflict of interest. While there is no record that Petitioner "sued" any other lawyer in a separately-styled civil action, there is no question that Petitioner filed a habeas corpus motion, prior to his first trial requesting the withdrawal of Hughes based on allegations of misconduct.  Moreover, there is no question that multiple attorneys represented Petitioner but were allowed to withdraw prior to his first trial.

13

examination, you were asked – [defense counsel] asked you, I believe, you are a convicted felon.

PETITIONER: That's correct.

PROSECUTOR: Okay. And what felonies have you been convicted of?

PETITIONER: Uh-I don't know if I can-do you have a copy of 'em? You can-

PROSECUTOR: You can't remember 'em?

PETITIONER: I-I sold some Benzedrex inhaler stuff in '86-over-the-counter medicine. Uh-I sold some of that. Uh-I went to prison for it. It's a noncontrolled substance. Uh-

PROSECUTOR: Other felonies-

PETITIONER: I've had a couple forgery charges in the 70's.

PROSECUTOR: Okay.

PETITIONER: Uh –

TRIAL COURT: Yes.

[CONFERENCE AT THE BENCH]

DEFENSE COUNSEL: He's getting past the 10-year rule.  He can ask him –

PROSECUTOR: This is cross examination.  You asked him on direct if he had any – if he was a felon.

DEFENSE COUNSEL: I said, "have you been in trouble with the law?"

PROSECUTOR: No, you asked him if he had – if he was a felon.

DEFENSE COUNSEL: No, I didn't.

PROSECUTOR: Yes, you did.

DEFENSE COUNSEL: A felony – I don't think – [RETURN TO OPEN COURT]

PROSECUTOR: What about aggravated robbery?

14

PETITIONER: Yes, I – in 1980, I robbed a store and got seven years and went to prison for it.

PROSECUTOR: Um-hum.  Does that pretty well cover – any other ones you can think of?  Forgery.  Aggravated robbery.  Controlled substance.  Anything else?

PETITIONER: No controlled substance.  It was over-the-counter medication.  I've made some mistakes.

(Second Trial Tr. at 702-703.)

On direct appeal, Petitioner argued that he was denied his right to a fair trial because the court improperly permitted the State to cross-examine him about his more than ten-year-old felony convictions.  The Arkansas Supreme Court held that Petitioner's argument was procedurally barred because he did not obtain a ruling on the objection at trial.  Alternatively, the Court held that, even assuming that it was preserved for review, it was nonetheless meritless as invited error:

> Moreover, even if appellant's argument had, in fact, been preserved for appeal, appellant himself invited the error of discussing his prior convictions that preceded the ten-year rule by testifying vaguely that he had been in trouble with the law and then by responding to the prosecuting attorney's questions by referring to convictions that were older than ten years. Appellant was aware of the trial court's ruling limiting the admissibility of his previous convictions. He, therefore, should have limited his responses to those convictions that had been ruled admissible. We have held that, under the doctrine of invited error, one who is responsible for error cannot be heard to complain of that for which he was responsible. *McGhee v. State*, 330 Ark. 38, 41, 954 S.W.2d 206, 208 (1997). Under this doctrine, appellant cannot now claim error.

*Anderson*, 354 Ark. at 108, 118 S.W.3d at 577-78.

Petitioner again raised this issue in his Rule 37 appeal.  The Court again rejected the argument, noting that it had been decided on direct appeal: "As to appellant's claims concerning the trial court's failure to prevent the prosecution from introducing evidence of some of his prior convictions, that issue was resolved in appellant's direct appeal." *Anderson*, 2006 WL 182066 at *3 (2006).

Petitioner now contends that he was denied his constitutional right to a fair trial because the trial court allowed the testimony of the old felony convictions in contravention of its ruling *in limine*. However, he has not come forward with any convincing legal argument to support his contention that the trial court had a duty to *sua sponte* rule that the prosecutor could not question Petitioner about his prior felony convictions.  Petitioner also has not explained how the Arkansas Supreme Court's disposition of the claim, as invited error, was contrary to or an unreasonable application of federal law, or an unreasonable determination of the facts based on the record of the state court proceeding.

Furthermore, even assuming that the trial court's admission of the old felonies was unconstitutional, Petitioner would nonetheless have to demonstrate that the error "had substantial and injurious effect or influence in determining the jury's verdict" in order to obtain relief on federal habeas review.  *See Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *see also Fry v. Pliler*, 127 S. Ct. 2321, 2328 (2007) (requiring federal habeas court to assess constitutional trial error under the *Brecht* "actual prejudice" standard "whether or not the state appellate court recognized the error and reviewed it for harmlessness").  Under that standard, this Court would conclude that Petitioner's reference to the old felonies was harmless error under *Brecht*, based on the overwhelming evidence of Petitioner's guilt.  Thus, the Court recommends that this ground for habeas relief be denied.

### 4.    Ineffective Assistance of Counsel

Fourth, Petitioner contends that counsel was ineffective: (1) in failing to move to "quash" the jury panel in order to obtain a change of venue; (2) in asking whether Petitioner had been in trouble with the law; (3) in failing to call certain witnesses at trial; and (4) in failing to acquire the

16

victim's blood sample and testing data for review by his expert witness.[9]  The Court will analyze

each of these ineffective assistance arguments separately.

### (a)    Counsel's Failure to Obtain a Change of Venue

Petitioner contends his attorney was ineffective in failing to "quash" the jury panel in order

to obtain a change of venue for his trial.  According to Petitioner, media coverage and newspaper

articles of his first trial defamed his character and led to "county-wide" notoriety.  Petitioner

acknowledges that, prior to his second trial, counsel moved for a change of venue.  The trial court,

in denying the motion, noted that the second trial was going to be some years removed from the

shooting,[10] and that the case should not have as much newsworthiness or controversy to justify

moving the trial.  (Second Trial Tr. at 228-229.)

Petitioner argues that, because some members of the jury panel knew of the case through

media accounts or the victim's family, he effectively was forced to "waste" strikes, and that counsel

was ineffective in moving to quash the entire panel during voir dire and obtain a change of venue.

In affirming Petitioner's Rule 37 appeal, the Arkansas Supreme Court noted Petitioner's allegations

"concerning his attorneys' actions on change of venue," but held that Petitioner had not demonstrated

prejudice, whether viewed in the context of establishing the merits of his conflict claim, *or as*

---

[9]In order to prevail on an ineffective assistance of counsel claim, Petitioner must demonstrate that his attorney's performance was deficient, and that the deficiency prejudiced his defense. *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). The first prong requires a showing that counsel's performance fell below an objective standard of reasonableness. *Winfield v. Roper*, 460 F.3d 1026, 1033 (8th Cir. 2006). If objectively unreasonable performance is established, the second prong requires a showing that there is a reasonable probability that, but for counsel's ineffectiveness, the result would have been more favorable to Petitioner.  *Lyons v. Luebbers*, 403 F.3d 585, 594 (8th Cir. 2005).

[10]The shooting occurred in September, 1999.  The second trial took place in 2001.

*independent allegations of ineffective assistance of counsel*:

> The allegations in the [Rule 37] petition are conclusory and do not provide sufficient factual support to show an actual conflict or a reasonable probability that the decision reached would have been different if the alleged errors had not been committed. None of appellant's allegations of error by counsel, including the failure to request a change of venue and the failure to call witnesses, provides a basis to find an actual conflict. At best, those allegations show that counsel and appellant disagreed on trial strategy. Counsel is not required to substitute the judgment of the accused for his or her own professional judgment. *See Hadley v. State*, 322 Ark. 472, 910 S.W.2d 675 (1995). Our review of the record does not support appellant's claim that counsel were openly hostile, or otherwise acted unprofessionally. Nor did the petition present a sufficient factual basis to support a claim of prejudice. As we noted in our opinion on appellant's direct appeal of his conviction, evidence of appellant's guilt was overwhelming. *To the extent that appellant's arguments may have been based upon an assertion that counsel's actions were not evidence of a conflict, but independent acts to show ineffective assistance of counsel, appellant has also failed to demonstrate prejudice.*

*Anderson*, 2006 WL 182066 at *3 (emphasis added).

In order for Petitioner to prevail on his claim that he received ineffective assistance when his attorney failed to move to quash the jury panel, he would have to show that there was a reasonable probability that, but for counsel's failure to do so,  the result would have been more favorable. Petitioner did not meet this burden.  First, Petitioner did not demonstrate any *actual prejudice* on the part of the jury that convicted him.  Second, while the United States Supreme Court has recognized that prejudice may be presumed where the jury pool is tainted "by so huge a wave of public passion that the impaneling of an impartial jury is impossible,"[11] Petitioner has made nothing approaching such a showing in this case.  Thus, the Court recommends that Petitioner's first ineffective assistance

---

[11]*See Irvin v. Dowd*, 366 U.S. 717, 728, (1961); s*ee also Rideau v. Louisiana*, 373 U.S. 723 (1963) (due process violation after defendant's filmed confession was repeatedly broadcast on the local television news of the small town); *Estes v. Texas*, 381 U.S. 532, 545-51, (1965) (presuming prejudice based on pretrial and trial media coverage that resulted in a "circus" atmosphere that deprived the defendant of a fair trial).

claim be denied.

**(b)     Counsel's Direct Examination of Petitioner Regarding "Trouble With The Law"**

Second, Petitioner argues that his attorney was ineffective for asking him on direct examination whether he had "any trouble with the law," which led the State to argue that Petitioner had "opened the door" to the admissibility of his prior felony convictions.  For the same reasons discussed earlier with respect to the trial court's rulings on the admissibility of those prior felonies, Petitioner has not met his burden of establishing a reasonable probability that, but for counsel's actions in asking him about his "trouble with the law," the outcome would have been more favorable.  Thus, the Court recommends that this ineffective assistance of counsel claim be denied.

**(c)     Counsel's Failure to Call Witnesses**

Petitioner contends that counsel was ineffective in failing to call several witnesses who could have testified to Markum's violent tendencies, strength, and dangerousness; thereby establishing Petitioner's state of mind in shooting Markum.  The Arkansas Supreme Court rejected Petitioner's "failure to call witnesses" claim in his Rule 37 appeal, noting that, at best, Petitioner and counsel disagreed on strategy. The Court also noted the overwhelming evidence of petitioner's guilt, and concluded that Petitioner had failed to demonstrate prejudice under *Strickland*.

Petitioner's argument ignores the fact that numerous witnesses *did testify* to Markum's propensity and notoriety for violence in the community.  Thus, Petitioner presented proof of his justification defense which was based on his knowledge that Markum was a violent man.  The decision about which witnesses to call at trial is a matter of trial strategy and tactics, and Petitioner has not met his burden of showing the level of prejudice required by *Strickland.  See e.g., Evans v.*

*Luebbers*, 371 F.3d, 445 (8th Cir. 2004) ("the strategic and tactical decisions made by counsel, though they may appear unwise in hindsight, cannot serve as the basis for an ineffective-assistance claim under *Strickland*.") Thus, the Court concludes that the Arkansas Supreme Court's analysis of Petitioner's ineffective assistance claim was not contrary to, or an unreasonable application of, federal law, nor an unreasonable determination of the facts based on the record of the state court proceeding. Thus, the Court recommends that this ineffective assistance of counsel claim be denied.

### (d)  Ineffective Assistance Arguments Concerning Dr. Valentine

Finally, Petitioner contends that his trial counsel was ineffective in not obtaining a sample of Markum's blood and the underlying lab data from the State Crime Lab report that he later used in his examination of Dr. Valentine. Petitioner relies on Dr. Valentine's trial testimony that, had this information been provided to him, his lab could have tested the veracity of the State Crime Lab results and confirmed whether, in fact, there was methamphetamine in Markum's system.

Respondent argues that Petitioner is in procedural default of this argument because he failed to raise it in state court. The Court agrees. Petitioner failed to raise the claim either in his Rule 37 Petition or in his appellate brief to the Arkansas Supreme Court. *See Moore-El v. Luebbers*, 446 F.3d 890, 896-97 (8th Cir. 2006) (habeas petitioner "must present both the factual and legal premises" of the claim to each appropriate state court and afford those courts "a 'fair opportunity' to review its merits" - where a petitioner fails to follow applicable state procedural rules in raising claims, they are procedurally defaulted). Thus, Petitioner is in procedural default of this claim.

Notwithstanding Petitioner having procedurally defaulted this claim, the Court can still proceed to reach the merits of the claim if Petitioner demonstrates the cause and prejudice exception

to the procedural default rule.[12] To establish "cause," the petitioner must "show some objective factor external to the defense" impeded his ability to comply with state procedures. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Additionally, it is clear that, if a habeas petitioner does not establish cause, there is no need to consider whether he has established prejudice. *Sherron v. Norris*, 69 F.3d 285, 289 (8th Cir. 1995).

Petitioner argues that the "cause" to excuse his procedural default arises from his attorney's failure to provide him with a complete copy of the trial transcript, which created an "external impediment" to raising the claim in his Rule 37 Petition. However, the alleged ineffective assistance of post-conviction counsel cannot constitute cause to excuse procedural default, because there is no Sixth Amendment right to post-conviction counsel. *See Burns v. Gammon*, 173 F.3d 1089, 1092 (8th Cir. 1999).

Petitioner also contends that he fairly presented the claim to the Arkansas Supreme Court in one sentence of his appellate reply brief, and that he filed several motions, after the fact, to compel the State to brief the point, and to have the Arkansas Supreme Court consider its merits. However, it is well-established Arkansas law that the Arkansas Supreme Court does not consider arguments that are raised for the first time in a reply brief. *See, e.g.*, *Owens v. State*, 354 Ark. 644, 659 n.1, 128 S.W.3d 445, 455 (2003) ("this court has repeatedly held that an argument cannot be raised for the first time in a reply brief"); *Echols v. State*, 354 Ark. 530, 553, 127 S.W.3d 486, 500 (2003) (explaining that arguments raised for the first time in a reply brief will not be considered because

---

[12]The Eighth Circuit has explained that a federal court can proceed to the merits of a procedurally defaulted habeas argument if the petitioner can "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law." *Wyldes v. Hundley*, 69 F.3d 247, 253 (8th Cir. 1995).

21

"the appellee is given no opportunity to respond to the argument").  Thus, the Court recommends that this ground for habeas relief be denied.

### III. Conclusion

IT IS THEREFORE RECOMMENDED that the Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 (docket entry #2) be DENIED, and that this case be DISMISSED, WITH PREJUDICE.

Dated this 3rd day of January, 2008.

_____
UNITED STATES MAGISTRATE JUDGE